## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

LAUREN BILLITER,

        Plaintiff,

v.                                                    CIVIL ACTION NO.  3:19-0288

ELIZABETH JONES,
Circuit Clerk, Mason County and
THE MASON COUNTY COMMISSION,

        Defendants.

### ORDER

Pending before the Court is Defendant Mason County Commission's Motion for Summary Judgment, ECF No. 55, and Defendant Elizabeth Jones's Motion for Summary Judgment, ECF No. 57. For the reasons stated below, the Court **GRANTS** Defendant Mason County Commission's Motion for Summary Judgment, ECF No. 55, and **DENIES, in part, GRANTS, in part,** and **HOLDS IN ABEYANCE, in part,** Defendant Elizabeth Jones's Motion for Summary Judgment, ECF No. 57.

### I. BACKGROUND

Plaintiff Lauren Billiter has alleged the following facts. Billiter, a registered Democrat, began working in 2013 as a Deputy Circuit Clerk in Mason County, West Virginia. ECF No. 1, at ¶¶ 2–3. In June 2017, Vera "Suzi" Caldwell, who is Billiter's mother and a Democrat, became the Circuit Clerk of Mason County. *Id*. at ¶¶ 7, 13. In November 2018, Defendant Elizabeth Jones, a Republican, defeated Caldwell in the race for Mason County Circuit Clerk. *Id.* at ¶ 8. Soon after being sworn in, Jones handed Billiter a letter of termination and said, "[t]his is for your mother."

*Id.* at ¶¶ 11, 16. Since Billiter was terminated, Defendants have hired three new deputy clerks, all of whom are registered Republicans. *Id.* at ¶¶ 17–18.

Billiter claimed her termination violated provisions of the West Virginia Human Rights Act; article III, sections 7, 10, 11, and 16 of the West Virginia Constitution; and the First and Fourteenth Amendments to the United States Constitution per 42 U.S.C. § 1983. *Id.* at ¶ 33. In January 2020, this Court dismissed Billiter's claims against the County Commission under § 1983 and article III of the West Virginia Constitution; Billiter's claims against Jones under article III, sections 10 and 11 of the West Virginia Constitution; Billiter's Fourteenth Amendment claim against Jones; and Billiter's familial status discrimination claim under the West Virginia Human Rights Act. ECF No. 39, at 14. Billiter's remaining claims include: the First Amendment per § 1983 against Jones; article III, sections 7 and 16 of the West Virginia Constitution against Jones; and the West Virginia Human Rights Act for ancestry discrimination against Jones and the County Commission. *Id.*

Defendant Jones has moved for summary judgment on three grounds. ECF No. 57, at 1–2. First, Jones argues that she is entitled to qualified immunity on Billiter's federal law claims because Jones's actions were "objectively reasonable." ECF No. 58 at 9–13. Second, Jones argues that she is entitled to qualified immunity on the West Virginia constitutional claims and the ancestry discrimination claim because Jones's actions were objectively reasonable and "ancestry discrimination has not been reasonably defined." *Id.* at 13–16. Third, Jones argues that Billiter's ancestry discrimination claim fails because "ancestry" concerns race, ethnicity, or national origin, and does not extend to Billiter's claim that she was discriminated against based on the identity of her parent. *Id.* at 16–20

Defendant Mason County Commission has moved for summary judgment on the grounds that it did not take an adverse action against Billiter and that Billiter has failed to state a claim for ancestry discrimination. ECF No. 55, at 1.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Defendant Jones is not entitled to qualified immunity for Plaintiff's § 1983 claim

Qualified immunity shields government actors from liability "insofar as their conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Essentially, the doctrine provides protection for government officials when they make decisions or take actions in "gray areas." *Brickey v. Hall*, 828 F.3d 298, 303 (4th Cir. 2016) (citing *Occupy Columbia v. Haley*, 738 F.3d 302, 307 (4th Cir. 2014)). It provides "breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The ultimate burden of proof regarding the defense of qualified immunity rests with the government official claiming it. *Brickey*, 828 F.3d at 303.

There are two prongs to the Qualified immunity analysis: (1) "whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. Courts have the discretion to decide which prong of the analysis to address first. *al-Kidd*, 563 U.S. at 735. Thus, the Court will address the second prong first.

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.

*Harlow*, 457 U.S. at 818–19.

Defendant Jones seemly concedes that the right to freedom of political association is clearly established. *See* ECF No. 58 at 9 ("Generally, the First Amendment's right to freedom of political association prohibits government officials from terminating public employees solely for supporting political opponents.") (quoting *McCaffrey v. Chapman*, 921 F.3d 159, 163 (4th Cir. 2019)). Indeed, "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). While there is a narrow exception to the constitutional rule that permits the patronage dismissals for public employees in policymaking positions, *Lawson v. Union Cty. Clerk of Ct.*, 828 F.3d 239, 248 (4th Cir. 2016), this

Court has previously noted that there "no indication in the complaint that Billiter's position as deputy circuit clerk involved politically-driven decision-making that would justify Billiter's termination under the *Elrod-Branti* exception." ECF No. 42; *see Lawson*, 828 F.3d at 247–49 (holding *Elrod-Branti* exception did not apply to deputy clerk of court).

What remains, then, is whether a reasonable government official in Defendant Jones's place should have known the alleged action violated the clearly established right. *See al-Kidd*, 563 U.S. at 741. Defendant Jones correctly contends that the relevant inquiry is an objective one. ECF No. 58 at 11. Accordingly, the proper question is whether a reasonable circuit clerk should have known that terminating a clerk's office employee because of their political association was violative of the law. The Court finds that a reasonable circuit clerk should have known.

When determining whether a reasonable officer should know that a right is clearly established, courts look to the specific scenario where the alleged wrong occurred. Simply put, is the state of the law such that the official has a "fair warning" that their action is unconstitutional? *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Here, it is not only clearly established that government employees cannot be fired because of their political association, but there is specific case law from this Circuit stating that deputy circuit clerks cannot be fired because of their political affiliation. *Lawson*, 828 F.3d at 248–49. Accordingly, Jones had more than "fair warning," and as the Circuit Clerk should have known that such action violated the First Amendment.

Finally, the Court turns to the first prong of the qualified immunity analysis. The Court finds that Billiter has provided sufficient evidence to support a claim that Defendant Jones violated a constitutional right. To establish a free association claim under the First Amendment, a plaintiff must prove that her "exercise of First Amendment rights was a substantial and motivating factor in the employer's decision to terminate" her. *Bland v. Roberts*, 730 F.3d 368, 375 (4th Cir. 2013)

(internal quotations omitted). The defendant, however, may "avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Id.*

Billiter has created a genuine factual dispute as to whether her political associations played a role Defendant Jones's decision to terminate her. Billiter maintains that at all relevant times she has been a registered Democrat. ECF No. 1, at 2. Her mother, Suzi Caldwell, was the Circuit Clerk in office before Jones. *Id.* at 1. Caldwell is also a Democrat. *Id.* at 2. Billiter supported her mother's bid for office. *Id.* at 4. Jones admitted in her deposition that she was aware of the Billiter's political affiliation and her support of her mother's campaign. ECF. No 60-1, at 77.

Defendant Jones, a Republican, defeated Billiter's mother in the 2018 election. ECF No. 1, at 2; ECF No. 6, at 3. Jones fired Billiter on the first day business day after she was sworn in as the new Clerk. ECF No. 1, at 2. Billiter alleges that when Jones terminated her, she handed her a letter and stated, "This is for your mother." *Id.* Following Billiter's termination, Billiter alleges that Jones and the Mason Country Commission hired three new employees, all of which are registered Republicans. *Id.*

Defendant Jones asserts that Billiter was terminated because she abandoned her job. ECF. No. 58, at 12. Jones claims that on the day of her swearing in, Billiter failed to introduce herself or speak to Jones, did not attended the swearing in ceremony or the reception after, refused to sign a welcome card for Jones, and that sometime during or after the reception, Billiter left work without obtaining permission from Jones, her new supervisor. *Id.* at 4. Billiter admits that she left early on that day, but asserts that "[s]he did so after becoming upset when hostile comments about being

Suzi Caldwell's daughter were directed at her by Defendant Jones' parents who were present in the Circuit Clerk's Office that day." ECF No. 60, at 5.[1]

Looking to these facts, while not deciding the truth of the matter, the Court is satisfied that Billiter has offered sufficient evidence to support her claim. Ultimately, whether Jones's termination of Billiter was substantially motivated by her political association or was based upon her behavior at work, is ultimately a material question of fact for a jury.

Defendant Jones has argued that Billiter's claim that Jones made the statement "this is for your mother" when she handed Billiter her termination letter is "'self-serving' and uncorroborated," making it insufficient to withstand Jones's motion for summary judgment. ECF. No. 58, at 15. While it may be the case that "plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action," *see Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989), the statement at issue here is not Billiter's own assertion, but a statement allegedly made by Defendant Jones. Additionally, the Court is not convinced that such "substantial evidence of legitimate nondiscriminatory reasons" for the termination exists in this case that would warrant summary judgment in Jones's favor. Accordingly, Billiter may proceed on her First Amendment claim per § 1983 against Defendant Jones.

## B. Defendant Mason County Commission is entitled to summary judgment because a reasonable jury could not find that the Commission aided and abetted Defendant Jones in the firing of Plaintiff

Defendant Mason County Commission has moved for summary judgment on the ancestry discrimination claim on the grounds that it "did not cause the plaintiff to suffer an adverse

---

[1] What happened between Billiter and Jones's parents is disputed. Billiter states that Jones's parents were hostile toward her, and that she left the office in tears. ECF No. 60, at 5. Jones avers that Jones's mother tried to engage Plaintiff in friendly conversation, but that Billiter responded "rudely" and shortly after the encounter "gathered her things" and said, "I'm leaving for the rest of the day." ECF. No. 58, at 5.

employment action." ECF No. 56, at 9. Billiter contends that the Commission can be held liable on two different grounds: (1) it was a joint employer of the Billiter and (2) the Commission aided and abetted Jones's termination of Billiter. ECF No. 61, at 3–6.

Deputy circuit clerks hired under West Virginia Code § 7-7-7(a) are considered joint employees of both the county commission and the elected circuit clerk. *See Burke v. Wetzel Cnty. Comm'n*, 815 S.E.2d 520, 529–30 (W. Va. 2018). Because the Code requires the assent of both the relevant county commission and the elected official to hire a clerk's office employee, both the commission and the official are considered employers of the employee. This joint employment, however, is not without bounds. Only the Circuit Clerk herself has the statutory authority to terminate employees. W. Va. Code § 7-7-7(h). Accordingly, the Commission had no statutory authority to terminate Billiter, and therefore was not acting as a joint employer at the time of her termination.

Billiter additionally claims that the Commission aided and abetted Defendant Jones. ECF No. 61, at 3–4. Under the Human Right Act, it is considered "unlawful discriminatory practice" for "any person" "to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices" prohibited by the Act. W. Va. Code § 5-11-9(7). While this provision has been used to hold co-employees liable for aiding and abetting discriminatory acts, *see, e.g.*, *Holstein v. Norandex, Inc.*, 461 S.E.2d 727, 732 (W. Va. 1995), it is debatable whether it can be used to hold a joint *employer* liable. However, assuming arguendo that this provision of the West Virginia Code applies, Billiter has cited no evidence that the Commission participated in the allegedly illegal actions of Defendant Jones. In fact, the only person from the Commission that could have played a role in the termination, Administrator Gerlach, is not a party to this action.

"Aiding and abetting" requires some kind conscious participation in the improper conduct. *See Price v. Halstead*, 355 S.E.2d 380, 386 (W. Va. 1987) (discussing "aiding and abetting" under tort law noting that "[t]he basis for imposing liability under an aiding and abetting theory is that if the breach of duty by the actor was substantially encouraged by the conduct of a third party, then this party may also be found liable"); *Hunt v. Di Bacco*, 71 S.E. 584, 857 (W. Va. 1911) (finding defendant aided and abetted trespassing when there was evidence he approved of and encouraged the wrongdoing).

Billiter contends that the Commission "through its agent Administrator Gerlach—aided Defendant Jones in her termination of the Billiter, and that a "jury could reasonably conclude that the purpose of that act was to harass, degrade and embarrass the Plaintiff and that Gerlach knew that when aiding Jones." ECF No. 61, at 3.

The Court is not convinced that Gerlach's approval of the termination letter supports an inference that either he or the Commission were knowingly aiding the allegedly unlawful acts of Defendant Jones. Jones testified that she showed the letter to the Administrator only ensure she was using the correct wording and following the proper procedure. ECF No. 46-1 at 41–43[2]. Jones

---

[2] **Q. John Gerlach, County Administrator, what does he know about the situation?**
A. The only thing that John knows is I wanted to make sure that I was doing procedure right and I did show him, I just wanted to make sure my wording and everything was right when I handed the letter. I don't ask permission of who I hire through John or who I fire. Now when I do hire, you know, I do turn that into the County Commission, but I just wanted him to know my actions and I showed him my letter.
**Q. By your letter you're referring to Exhibit 3, the termination letter?**
A. Yes. Correct.
**Q. So you had Mr. Gerlach review that before you gave it to Ms. Billiter?**
A. Correct.
**Q. Did Mr. Gerlach approve the letter?** …
A. He just looked at the letter and he said the writing looks good. That's what he said.
**Q. Was there any other discussion, that is in other words did you tell Mr. Gerlach what the reason was for this action of terminating the plaintiff? Did he say anything to you? Was there any conversation between you two at all?**
A. I believe I did tell him how uncomfortable that I felt and that I just knew that it was the best for my office to do what I was doing. And other than that, no.
**Q. Did Mr. Gerlach make any response when you told him that?**
A. No

stated that Mr. Gerlach did not make any remarks other than to say that "the writing looks good. Jones's presentation of the letter to Mr. Gerlach and Mr. Gerlach's response indicate that they were acting in accordance with the West Virginia Code, which requires the circuit clerk to submit a discharge statement with the County Commission when she terminates an employee. *See* W. Va. Code § 7-7-7(h) ("Each county official named in this section shall have the authority to discharge any of his or her assistants, deputies or employees by filing with the clerk of the county commission a discharge statement specifying the discharge action . . .").

Even assuming that everyone in the office knew Billiter was the daughter of Caldwell, at most it makes the limited action taken by Gerlach suspicious. There is no proof that he or the Commission participated in, approved of, encouraged, or otherwise aided Jones's decision to fire Billiter for an improper reason. Accordingly, the Court finds that Plaintiff has failed to provide evidence such that a reasonable jury could find the Commission aided and abetted Defendant Jones's termination of Billiter.

**C. Plaintiff has failed to state a claim for ancestry discrimination under the West Virginia Human Rights Act**

The Human Rights Act provides:

> Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, age, blindness or disability. Equal opportunity in housing accommodations or real property is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, blindness, disability or familial status.

W. Va. Code § 5-11-2.

Generally, courts construe the Human Rights Act in accordance with Title VII. *Henegar v. Sears*, *Roebuck & Co.*, 965 F. Supp. 833, 836 (N.D.W. Va. 1997) (citation omitted). Title VII is not instructive here, however, because as previously noted by the Court, Title VII does not expressly prohibit ancestry discrimination. *See* 42 U.S.C. § 2000e-2(a). An earlier version of Title

VII did include ancestry, but the drafters deleted it from the final version. *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 89 (1973) (citing H.R. 7152, 88th Cong., 1st Sess., § 804, Oct. 2, 1963 (Comm. print)). The Supreme Court has explained this deletion likely occurred because the drafters considered "national origin" and "ancestry" to be synonymous. *Id.*

West Virginia's Human Rights Act does not define the word "ancestry," nor does any decision of the West Virginia Supreme Court of Appeals. Billiter argues that "ancestry" is to be broadly interpreted and points to dictionary definitions of the term to support this assertion.[3] Billiter also looks to caselaw from the Ninth Circuit stating that ancestry may mean more than race or ethnicity in a certain statutory contexts. *See Davis v. Guam*, 932 F.3d 822, 836–37 (2019) ("But ancestry and race are not identical legal concepts. State and federal laws are replete with provision that target individuals based on biological descent without reflecting racial classifications. These include law of intestate succession, . . . citizenship, . . . and child custody laws.").

Defendants argue that ancestry discrimination "concerns claims of discrimination on the basis of race, ethnicity, and national origin; not the identity of a parent." ECF No. 58; ECF No. 56 at 10. They argue this reading is bolstered by the limited ancestry discrimination cases that have been decided in West Virginia, including *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152 (W. Va. 1995), and *Fairmont Specialty Services v. West Virginia Human Rights Commission*, 522 S.E.2d 180 (W. Va. 1999).

The Court does not believe that the including of "ancestry" in the Human Rights Act is merely redundant or meaningless. *Barefoot* and *Fairmont Specialty Services* suggest that ancestry

---

[3] The Court previously noted, "Black's Law Dictionary defines ancestry as "[a] line of descent; collectively, a person's forebears; lineage." *Ancestry*, *Black's Law Dictionary* (11th ed. 2019). The Merriam-Webster Unabridged Dictionary's definition includes "persons initiating or comprising a line of descent." *Ancestry*, *Merriam-Webster Unabridged*, http://unabridged.merriam-webster.com/unabridged/ancestry (last visited Jan. 6, 2020)." ECF No. 39, at 13.

is a meaningful part of the act. Discrimination based on ancestry means discrimination based on some type of characteristic like race, ethnicity, or national origin that is passed down by lineal ascendants. In *Barefoot*, the Court used both "race" and "ancestry" to describe discrimination against a plaintiff for her Native American heritage. *Barefoot*, 457 S.E.2d at 162–63. While both terms were used, Court also talked discussed the significance of heritage when comparing the plaintiff to another employee with Native American relatives. *Id.* at 163.

In *Fairmont Specialty Services*, the West Virginia Supreme Court of Appeals upheld an award to a plaintiff who alleged harassment based on her ancestry. *Fairmont Specialty Servs.,* 522 S.E.2d at 183. Specifically, the plaintiff was "a United States citizen of Mexican ancestry." *Id.* at 184. There the plaintiff complained that a coworker made derogatory remarks relating to her being "a Mexican," *Id.* at 183–88. The Court explicitly discussed how this is the kind of language that is actionable under the anti-discrimination laws like the Human Rights. *Id.* at 188.

> Conduct such as use of the "N" word to describe an African–American, the "C" word to describe women, the terms "Sic," "W.P." or "Jap" to describe those of other ancestral heritages, or other racial, sexual or ethnic pseudonym, intended to denigrate others, cannot be tolerated in the workplace. They are the type of outrageous discriminatory conduct that may be considered to be of an aggravated nature such that the threshold for it to be actionable is much lower than more subtle forms of discrimination which cumulatively cause conduct to be actionable under the Human Rights Act.

*Id.* at 188 n.8.

This kind of actionable discrimination relates to innate characteristics that are shared by a class of persons. This can be seen in the other protected classes under the West Virginia Human Rights Act. W.Va. Code § 5-11-2 ("Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national, origin, ancestry, sex, age, blindness or disability.").

Basic principles of statutory construction support this reading of the statute. The cannon of noscitur a sociis, which translates to "it is known by its associates," holds that "the meaning of an unclear word or phrase, esp[ecially] one in a list, should be determined by the words immediately surrounding it." *Noscitur A Sociis*, *Black's Law Dictionary*, (11th ed. 2019). The West Virginia Supreme Court of Appeals has used this maxim to interpret statutes noting, "the meaning of a word or phrase may be ascertained by reference to the meaning of the other words or phrases with which it is associated." *Darlington v. Mangum*, 450 S.E.2d 809, 811 (W. Va. 1994) (quoting *Wolfe v. Forbes*, 217 S.E.2d 899 (W. Va. 1975)). Here, the meaning of "ancestry" should be understood to mean something akin to the words surrounding it, the other grounds upon which discrimination is forbidden under the West Virginia Human Rights Act.

Thus, while ancestry discrimination is actionable under the Act, the discrimination that the Billiter is alleging is not it. The crux of Billiter's claim is that Jones terminated her because of her and her mother's political affiliation. This is simply not the kind of innate characteristic that anti-discrimination laws like the West Virginia Human Rights Act were enacted to protect.

To whatever extent it has been argued, and even conceded, that terminating an employee because the employer does not like her mother or father—or because the employer does not like her mother's political actions—may be improper or wrong, it is improper because civilized society looks down upon it, not because the law forbids it. Accordingly, the Court grants summary judgment for the Defendants on the ancestry claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Mason County Commission's Motion for Summary Judgment, ECF No. 55, and **DENIES, in part, GRANTS, in part,** and **HOLDS IN ABEYANCE, in part,** Defendant Elizabeth Jones's Motion for Summary Judgment,

ECF No. 57. Plaintiff may proceed on her § 1983 claim against Defendant Jones. Plaintiff's Claims for ancestry discrimination under the West Virginia Human Rights Act against Defendant Jones and the Mason County Commission are dismissed. Defendant Jones's Motion for Summary Judgment on Plaintiff's claims under the West Virginia Constitution are held in abeyance, pending Plaintiff's decision to voluntarily drop the claims or stay the action pending a decision from the West Virginia State Supreme Court of Appeals.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:      September 22, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE